IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOS. A. BANK CLOTHIERS, INC.,

    *Plaintiff*,

    v.

J.A.B.-COLUMBIA, INC. et al.,

    *Defendants*.

Civil Action No. ELH-15-3075

## MEMORANDUM OPINION

This case arises from a dispute concerning three franchise agreements.  Plaintiff Jos. A. Bank Clothiers, Inc. ("Jos. A. Bank" or "JAB") is a men's clothing store with more than 500 locations, of which fourteen are franchised.  ECF 1, ¶¶ 7, 9.  Defendants J.A.B.-Columbia, Inc.; J.A.B.-Harbison, Inc.; and J.A.B.-Forest Drive, Inc. (collectively, the "Franchisees") own three of Jos. A. Bank's franchise stores.  *Id.* at 1.  The Franchisees' initial franchise term is at an end, and the parties disagree on whether the Franchisees are entitled to more than one renewal of their franchise term.  ECF 1; ECF 10.

JAB has filed a Complaint seeking a declaratory judgment.  ECF 1.[1]  It asks the Court to declare that the franchise agreements in issue provide for only a single franchise renewal and not unlimited or perpetual franchise renewals; that the Franchisees' failure to execute the form of successor franchise agreement offered to them by Jos. A. Bank, without further renewals, constitutes an election by them not to buy a successor franchise; and that the Franchisees' election not to buy a successor franchise allows JAB to terminate the franchises of the

---

[1] Jurisdiction is founded on diversity.  ECF 1, ¶ 5; *see also* 28 U.S.C. § 1332.  Jos. A. Bank is a Delaware corporation with its principal places of business in Maryland and California (ECF 1, ¶ 1), and the Franchisees are North Carolina corporations headquartered in North Carolina.  *Id.* ¶¶ 2-4.  The stores at issue are all located in Columbia, South Carolina.  The amount in controversy is alleged to exceed $75,000.  *Id.* ¶ 5.

Franchisees at any time. *Id.* at 9-10. JAB appended the three franchise agreements to its Complaint. ECF 1-1; ECF 12; ECF 1-3.

The Franchisees have pleaded three counterclaims, two of which remain. ECF 10, ¶¶ 33-41.[2] The first is for a declaratory judgment that the Franchisees are entitled to a renewed franchise agreement on the same terms as their original franchise agreement, including its renewal clause. *Id.* ¶¶ 28, 37. The second counterclaim is for breach of contract, which the Franchisees allege occurred when Jos. A. Bank tendered the improper successor franchise agreement to the Franchisees. *Id.* ¶ 40. The Franchisees seek "not less than $75,000.00" in damages as a result of the breach. *Id.*

After a lengthy and contentious discovery period, JAB filed a motion for summary judgment as to all claims and counterclaims. ECF 63. The motion is supported by a memorandum of law (ECF 63-1) (collectively, the "JAB Motion") and ten exhibits. The Franchisees oppose the JAB Motion and filed a cross-motion for summary judgment. ECF 68. That motion is also supported by a memorandum (ECF 68-1) (collectively, the "Franchisees' Motion") and many exhibits.[3] Jos. A. Bank filed a combined opposition to the Franchisees' Motion and a reply in support of its own summary judgment motion. ECF 73. The Franchisees replied (ECF 74) and requested a hearing. ECF 75.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall deny both motions.

---

[2] The Court (Motz, J.) dismissed the Franchisees' counterclaim for misrepresentation in an Order of March 7, 2016. ECF 27.

[3] The memorandum of law (ECF 68-1) supporting the Franchisees' Motion is redacted, as are several exhibits, filed at ECF 72. Sealed, unredacted copies of the memorandum and exhibits are docketed at ECF 69.

# I.   Factual Background[4]

## A.   The Franchise Partnership

Jos. A. Bank, a men's retail clothier, first began franchising in the early 1990s.  ECF 68-2 (Declaration of John W. Bell, III), ¶ 9.   In 1991, JAB hired John W. Bell, III, to recruit franchisees.  *Id.* ¶ 11; ECF 68-9 (Deposition of John W. Bell, III) at 4.   Bell became Jos. A. Bank's first franchise owner when he converted his family's business to JAB's first franchise locations in Asheville, North Carolina, and Knoxville, Tennessee in 1992.  ECF 68-2, ¶ 9.

Later in the 1990s, Bell partnered with John A. Batt, Jr., and John F. French—who together owned a Jos. A. Bank franchise store in New Orleans (*id.* ¶ 12)—to open more stores. *Id.* ¶ 13.  Bell, Batt, and/or French, sometimes with other co-owners, control thirteen of Jos. A. Bank's fourteen franchise stores, and Bell provides management services to all fourteen franchise stores.  *Id.* ¶ 5.  In addition to the locations mentioned, these include stores in Jackson, Mississippi; Montgomery, Alabama; Augusta, Georgia; Baton Rouge, Louisiana; and Metairie, Louisiana.  *Id.* ¶¶ 12-13.  From 1998 to 2005, Jos. A. Bank did not establish any new franchise stores.  *Id.* ¶ 14.

Jos. A. Bank entered franchise agreements with the Franchisees beginning in August 2005, when Bell, Batt, and French agreed with Jos. A. Bank to open a franchise store in Columbia, South Carolina.  *See* ECF 1-1; ECF 63-2 at 13-14 (deposition of Charles Frazer, Esq.).  Then, in October 2009 and April 2010, Jos. A. Bank and Bell, Batt, and French agreed to open two more stores in Columbia, South Carolina: one on Harbison Boulevard ("Harbison") and one on Forest Drive in Trenholm Plaza ("Forest Drive").  *See* ECF 1-2; ECF 1-3; *see also* ECF 63-2 at 14-16.   These three South Carolina franchise stores are the defendants-

---

[4] The Court notes that the electronic pagination does not always correspond to the page numbers that appear on the parties' submissions.  I shall cite to the electronic pagination.

counterclaimants in this suit. The Franchisees' initial franchise agreements expired on August 31, 2015. *See* ECF 1-1 at 5; ECF 1-2 at 6; ECF 1-3 at 6.

Bell, Batt, and French also opened a franchise in West Knoxville, Tennessee, which is the subject of parallel litigation. *See* ECF 68-38 (West Knoxville franchise agreement); *see also J.A.B. - West Knoxville, Inc. v. Jos. A. Bank Clothiers, Inc.*, ELH-16-2667. In August 2011, JAB granted one more franchise, for a store located in Mandeville, Louisiana, part of the New Orleans market. ECF 63-2 at 20 (list of franchises by origination date); ECF 73-6 at 24 (deposition of Charles Frazer, Esq.). The Mandeville franchise agreement did not provide for any renewals. *See* ECF 68-25 at 30 (Mandeville franchise agreement).

In 2014, Jos. A. Bank was acquired by The Men's Wearhouse, Inc. ("Men's Wearhouse"). *See* ECF 73 at 22. JAB maintains that it is no longer "in the franchising business." ECF 63-1 at 8. The Franchisees agree that JAB "clearly wants to get out of franchising," but note that it has not yet done so. ECF 68-1 at 10.

### B. The Renewal Process

The substance of Jos. A. Bank's franchise agreements has remained largely the same since the 1990s. Although the standard agreement was reorganized and revised in 1996 (*see* ECF 68-33, Montgomery franchise agreement), the provisions are similar to the earlier agreements.

By the early 2000s, the periods of the initial agreements, which provided for ten-year terms, began to expire. ECF 68-2, ¶¶ 17-20. It appears that Jos. A. Bank renewed those franchises for ten year periods without requiring the franchisees to negotiate or execute a new franchise agreement, instead merely requiring a notice of renewal and receipt of a franchising fee. *Id.* ¶¶ 20-24. The Franchisees refer to this practice as "rolling renewals," and assert that it

has been the universal practice of Jos. A. Bank to allow franchisees to repeatedly exercise the renewal option contained in their original franchise agreement. ECF 68-1 at 16.

In at least two instances, however, Jos. A. Bank and a franchisee confronted the issue of whether the renewed agreement would itself allow for further renewals. When the Asheville and Knoxville franchises came up for renewal in 2002, Jos. A. Bank struck a deal with the franchise owners: One more renewal (from 2012 to 2022) would be allowed, and on the same general terms as the original franchise agreement, but only in consideration for the waiver of a right of first refusal provided for in the Asheville franchise agreement. ECF 73-6 at 63 (letter from Frazer to Bell, dated June 19, 2002, about JAB-Knoxville and JAB-Asheville). In another instance, the New Orleans store was granted a third term, but that term was limited to less than six years, and did not mention a further right to renew. *Id.* at 67 (email from Frazer to Bell).

After the Mandeville franchise was granted, Jos. A. Bank renewed five franchises, including the one for the New Orleans store. ECF 68-2, ¶¶ 27-31. The most recent, in the fall of 2014, was for the Jackson, Mississippi store, originally opened in 1994. *Id.* ¶ 31. The Jackson store was renewed on its original terms, without execution of a new agreement. *Id.*[5]

On February 5, 2015, the Franchisees notified JAB in writing of their desire to renew the franchises for the three stores. *See* ECF 1, ¶ 20. On March 30, 2015, JAB informed the Franchisees that they each could purchase a ten-year successor franchise. ECF 63-5 at 2 (letter from Frazer). JAB offered the Franchisees an updated version of the Mandeville agreement (the "Mandeville Form") for each of the stores. *Id.* at 3. This agreement was largely similar to the Franchisees' original agreement, but it did not provide for any renewals. *Id.* The Franchisees

---

[5] As discussed *infra*, the Franchisees argue that, because the Jackson, Mississippi franchise was extended without a new agreement, the original franchise agreement, executed in 1994, became JAB's "then-current," and "most recently used" form, and JAB may not deviate from the text of the 1994 form. ECF 68-1 at 38.

claimed that they were entitled to franchise agreements that gave them the right to another ten-year renewal *after* 2025. *See* ECF 63-7 at 2-3 (letter of April 24, 2015). They objected to the proposed franchise agreements by letter of June 19, 2015. *See* ECF 63-6 at 2-6. JAB rejected the Franchisees' position in a letter of July 8, 2015, but extended the deadline for the Franchisees to execute the proposed agreements until July 22, 2015. ECF 63-8. The Franchisees declined to sign JAB's proposed agreements. *See* ECF 1, ¶ 28.

This suit followed on October 9, 2015. ECF 1. As in the parties' earlier correspondence, JAB contends, *inter alia*, that the Franchisees are entitled only to a single renewal. *Id.* at 9-10. Moreover, Jos. A. Bank insists that the Mandeville Form is the appropriate renewal form. ECF 73 at 22-23. The Franchisees counter that they should be allowed to renew on the same terms as their original agreements from 2005, 2009, and 2010, including those agreements' renewal clauses providing for a subsequent franchise renewal. ECF 63-6; ECF 10. In the alternative, the Franchisees assert that, under the language of the original agreements, they should be offered the terms of the franchise agreement most recently used by a renewing franchise—in this case, the Jackson franchise (the "Jackson Form"). ECF 68-1 at 38.

## I.      The Franchise Agreements

The central question in this case is one of contract interpretation. There are several provisions of the franchise agreements relevant to the disposition of the motions. For purposes of this matter, the relevant language is the same in each of the three franchise agreements (hereinafter collectively referred to as the "Agreement").[6]

---

[6] Throughout this Memorandum Opinion, I treat the Columbia store's agreement, at ECF 1-1, as the standard agreement.

In Section 2.01 of the Agreement, Jos. A. Bank grants the Franchisees "the right . . . to sell the Products at the Store and use the System in connection therewith, for a term starting on the date of this Agreement and expiring on August 31, 2015 (the 'Term')." ECF 1-1 at 5.

Section 16, which is titled "Renewal Rights," is the focus of the parties' arguments. Section 16.01 states, in relevant part: "Franchisee has the right, subject to the conditions contained in Section 16, to buy a successor franchise for the Store on the terms and conditions of Franchisor's then current form of franchise agreement, if upon expiration of the Term" the franchisee is in compliance with the Agreement and agrees to keep the store updated to Jos. A. Bank's specifications. *Id.* at 27-28.

Section 16.03 states, in relevant part, *id.* at 28:

If Franchisee has the right to buy a successor franchise in accordance with Section 16.01 and states its desire to exercise that right . . . , Franchisor and Franchisee . . . will execute the form of franchise agreement (which may contain provisions, including royalty fees, materially different from those contained herein) and all ancillary agreements . . . which Franchisor then customarily uses, or most recently used, in granting franchise rights for Jos. A. Bank Stores . . . . Failure by Franchisee . . . to sign such agreements . . . within 30 days after delivery shall be deemed an election by Franchisee not to buy a successor franchise for the Store.

The phrase "then current form" in Section 16.01 and the phrases "then customarily uses" and "most recently used" in Section 16.03 are not defined. Their meaning is disputed.

Section 19.07, titled "Waiver of Obligations," discusses the effect of Jos. A. Bank's actions in relation to other franchisees. It states, in relevant part, *id.* at 34:

Franchisor and Franchisee shall not be deemed to have waived any right reserved by this Agreement by virtue of any custom or practice of the parties at variance with it; any failure, refusal or neglect by Franchisee or Franchisor to exercise any right under this Agreement . . . or to insist upon exact compliance by the other with its obligations hereunder; any waiver, forbearance, delay, failure or omission by Franchisor to exercise any right, whether of the same, similar or different nature, with respect to other Jos. A. Bank Stores; or the acceptance by Franchisor of any payments due from Franchisee after any breach of this Agreement.

Section 19.01 provides that the Agreement shall be governed by the laws of Maryland. *Id.* at 33. Section 19.02 provides for exclusive jurisdiction in the state where Jos. A. Bank has its principal place of business. *Id.* Section 19.09 provides that the language of the Agreement "shall be construed according to its fair meaning and not strictly against any party." *Id.* at 35. Section 19.09 also includes an integration clause, specifying that "this Agreement . . . constitutes the entire agreement of the parties. Except as otherwise expressly provided herein, there are no other oral or written agreements, understandings, representations or statements . . . that either party may or does rely on or that will have any force or effect." *Id.*

## II. Legal Standards

### A. Summary Judgment

Both parties have moved for summary judgment under Fed. R. Civ. P. 56. Under Rule 56(a), summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. Moreover, in resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *accord Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). However, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir 2016). Thus, in considering a summary judgment motion, the court may not

make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Moreover, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied,* 540 U.S. 822 (2003); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). Simply because both parties have filed for summary judgment does not mean that summary judgment to one party or another is necessarily appropriate. "Both motions must be denied if the court finds that there is a genuine issue of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Wright, Miller & Kane, *Federal Practice & Procedure* § 2720, at 336-37 (3d ed. 1998, 2012 Supp.).

### B. Principles of Contract Interpretation

The heart of this dispute involves a matter of contract interpretation. It is undisputed that Maryland law applies here. As noted, the Agreement under which this suit arises specifies that it is to be governed by Maryland law. *See* ECF 1-1 at 33. Therefore, it is helpful to review the principles of contract formation and interpretation under Maryland law.

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Richard A. Lord, 1 *Williston on Contracts* § 1:1, at 2-3 (4th ed. 1990); *accord* Restatement (Second) Contracts § 1, at 5 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006). "A contract is formed when an unrevoked offer made by one person is accepted by another." *Prince George's County v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984). Thus, mutual assent is an integral component of every contract. *See, e.g.*, *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015). *See also Mitchell v. AARP*, 140 Md. App. 102, 116 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'") (citations omitted). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

A contract may be oral or written, as well as express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'" *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cnty. Comm'rs of Caroline Cnty v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)). Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement. *See Canaras v. Lift Truck Services*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974); *Cnty. Comm'rs for*

*Carroll Cnty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377-78, 941 A.2d 1181, 1209-10 (2008). If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is generally not enforceable. *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L & L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1956) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

"'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted); *see CB Structures, Inc. v. Potomac Electric Power Co.*, 122 F. Supp. 3d 247, 251 (D. Md. 2015). To determine the parties' intentions, courts look first to the written language of the contract. "[G]enerally, when seeking to interpret the meaning of a contract [the] search is limited to the four corners of the agreement." *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006); *see 100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 233, 60 A.3d 1, 22 (2013); *Dynacorp Ltd. v. Armatel Ltd.*, 208 Md. App. 403, 469, 56 A.3d 631, 670 (2012). Moreover, a contract is construed "'in its entirety,'" so as to give effect "'to each clause,'" if "'reasonably possible.'" *Dumbarton Imp. Ass'n, Inc.*, 434 Md. at 52, 73 A.3d at 232-33 (citation omitted).

Under Maryland law, the interpretation of a contract is ordinarily a question of law for the court. *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014) (citing *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004)); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017).

"Maryland courts interpreting written contracts have long abided by the law of objective contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Urban Growth Prop. Ltd. P'ship v. One W. Baltimore St. Assocs. LLC*, No. 882, Sept. Term, 2015, 2017 WL 526559, at *5 (Md. Ct. Spec. App. Feb. 9, 2017) (citation omitted) (unpublished); *see Dumbarton Imp. Ass'n, Inc.*, 434 Md. at 51, 73 A.3d at 232; *Cochran*, 398 Md. at 16, 919 A.2d at 709; *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014) (internal quotations and alteration omitted).

The court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement . . . ." *Dumbarton Imp. Ass'n, Inc.*, 434 Md. at 52, 73 A.3d at 232. Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (quoting *General Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)); *see also Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated."), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997).

It is the role of the court to determine whether a contract is ambiguous. *Sy–Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003). Of relevance here, "[u]nder the objective view [of contract interpretation], a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible [to] more than one meaning." *Calomiris v. Woods*, 353 Md. 425, 436, 727 A.2d 358, 363 (1999) (citation

omitted); *see Ocean Petroleum, Co. v. Yanek*, 416 Md. 74, 87, 5 A.3d 683, 690-91 (2010) (citation omitted); *Cochran*, 398 Md. at 17, 919 A.2d at 710; *Sy–Lene of Washington*, 376 Md. at 167, 829 A.2d at 547 (citations omitted); *Auction & Estate Representatives, Inc. v. Ashton,* 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999).

Notably, a contract is not ambiguous merely because the parties disagree as to its meaning, *Sierra Club v. Dominion Cove Point LNG, L.P.*, 216 Md. App. 322, 334, 86 A.3d 82, 89 (2014), or "simply because, in litigation, the parties offer different meanings to the language." *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 400 Md. 718, 751, 929 A.2d 932, 952 (2007). Nor is there ambiguity "'simply because a strained or conjectural construction can be given to a word.'" *Dumbarton Imp. Ass'n, Inc.*, 434 Md. at 53, 73 A.3d at 233 (citation omitted). And, "[a] term which is clear in one context may be ambiguous in another." *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 508, 667 A.2d 617, 619 (1995).

As indicated, to determine the parties' intentions, a court first looks to the written language of the contract. *See Walton*, 391 Md. at 660, 894 A.2d at 594. "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citations omitted). A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean. *See Dumbarton Imp. Ass'n, Inc.*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g.*, *Scarlett Harbor*, 109 Md. App. at 291, 674 A.2d at 142 ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed.").

Based on well-established principles, "[if] the language employed in a contract is unambiguous, a court shall give effect to its plain meaning." *DIRECTV*, 376 Md. at 312, 829 A.2d at 630 (citations omitted). Where the parties to a contract have not indicated that a particular term has "a special or technical meaning," the word is given its "ordinary and accepted meaning as used and understood by reasonably prudent laypersons in daily life." *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 780-81, 625 A.2d 1021, 1032 (1993).

A court may not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensdel v. Winchester Constr. Co.*, 392 Md. 601, 623, 898 A.2d 472, 485 (2006). Indeed, "[i]t is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris*, 353 Md. at 445, 727 A.2d at 368 (quoting *Canaras*, 272 Md. at 350, 322 A.2d at 873); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443 (Table), 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck."). But, with regard to interpretation of a term, a court's "first resort is to a general dictionary." *Bausch & Lomb Inc.*, 330 Md. at 781; 625 A.2d at 1032; *accord Megonnell v. United Servs. Auto. Ass'n.*, 368 Md. 633, 647, 796 A.2d 758, 767 (2002); *see also Sierra Club v. Dominion Cove Point LNG, L.P.*, 216 Md. App. 322, 335, 86 A.3d 82, 90 (2014) ("[W]e . . . begin with the dictionary definition to determine whether there is any ambiguity in the phrase.").

Consideration of extrinsic evidence is unnecessary when a contract is unambiguous. *DIRECTV*, 376 Md. at 312, 829 A.2d at 630 (citations omitted); *see Clendenin Bros. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459, 889 A.2d 387, 393 (2006). Conversely, if the contract is ambiguous,

"'the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract.'" *Cnty. Commissioners of Charles Cnty. v. St. Charles Associates Ltd. P'ship*, 366 Md. 426, 445, 784 A.2d 545, 556 (2001) (citation omitted); *accord John L. Mattingly Const. Co., Inc. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 327, 999 A.2d 1066, 1074 (2010); *see Point's Reach Condominium Council of Unit Owners v. Point Homeowners Ass'n, Inc.*, 213 Md. 152, 157-58, 582 A.2d 493, 495 (1990). Among other things, if a contract is ambiguous, "'extrinsic evidence may be consulted to determine . . . whether the ambiguous language has a trade usage.'" *Mut. Fire Ins. Co. of Calvert Cty. v. Ackerman*, 162 Md. App. 1, 15, 872 A.2d 110, 118 (2005) (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 404, 488 A.2d 486, 497 (1985)); *see also Della Ratta, Inc. v. Am. Better Cmty. Developers, Inc.*, 38 Md. App. 119, 130, 380 A.2d 627, 635 (1977). But, extrinsic evidence may "not be used to contradict other, unambiguous language." *Calomiris*, 353 Md. at 441, 727 A.2d at 366.

If a court determines as a matter of law that the contract is ambiguous, "'it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis.'" *Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 235 (4th Cir. 2007) (quoting *Goodman v. Resolution Trust Corp.,* 7 F.3d 1123, 1126 (4th Cir. 1993)). Conversely, if "'resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.'" *Washington Metro. Area Transit Auth.*, 476 F.3d at 235 (quoting *Goodman*, 7 F.3d at 1126). Thus, if the contract is ambiguous, I may only grant summary judgment if extrinsic evidence of

the parties' intentions compels a particular interpretation as a matter of law.  *See Sheridan v. Nationwide Ret. Sols., Inc.*, 313 F. App'x 615, 619 (4th Cir. 2009).

Generally, "'ambiguities are resolved against the draftsman of the instrument.'"  *John L. Mattingly Const. Co.*, 415 Md. at 334, 999 A.2d at 1078 (citation omitted).  Moreover, the court may construe an ambiguous contract only "'if there is no factual dispute in the evidence.'"  *CB Structures, Inc.*, 122 F. Supp. 3d at 251 (citation omitted); *see also Chorley Entrs. v. Dickey's Barbecue Restaurants, Inc.*, 807 F.3d 553, 563 (4th Cir. 2015).

## III.  Discussion

It is undisputed that if the Franchisees meet the conditions precedent set forth in Section 16.01, they are entitled to buy a successor franchise.  The issue is the terms on which that successor franchise may be purchased.

Jos. A. Bank argues that this question is resolved by the plain language of Section 16.01, by which the Franchisees have the right to buy "*a* successor franchise."  To be sure, the Agreement provides for **a** renewal, and JAB insists that the word "'[a]' means 'one.'"  ECF 63-1 at 12 (emphasis added).  According to JAB, if the parties meant to allow the purchase of multiple franchises, they could have and would have said so.  *Id.*[7]  Jos. A. Bank cites Maryland cases to show that contracts should not be read to be perpetual unless they say so clearly and explicitly. *Id.* at 13.  *See, e.g., Boland v. Boland*, 423 Md. 296, 370, 31 A.3d 529, 573 (2011).  Because the Agreement does not provide explicitly for perpetual renewals, Jos. A. Bank asserts that the Franchisees are not entitled to perpetual renewals, and are entitled only to "a" single renewal. ECF 63-1 at 14.

---

[7] Of course, if the parties meant only "one," they also could have said so.

This view is too simplistic. Jos. A. Bank is correct that the Agreement does not explicitly provide for multiple renewals. But, the Agreement does not clearly *limit* the Franchisees to a single renewal. For one, "a" is an indefinite article, and can be used in a variety of ways. For example, an employee who is "entitled to a lunch break" is obviously not limited to only one lunch break while employed. In any event, the meaning of "a" in this section of the Agreement is not the central question. The Agreement only covers the "Term," which began on the date the Agreement was signed and expired on August 31, 2015. ECF 1-1 at 5. One would not necessarily expect the Agreement to specify some defined number of possible renewals, and it is certainly not clear that the parties limited themselves to a single renewals by the insertion of the word "a."

The more important question is what happens *after* the initial Term. Do the terms of the renewed, successor franchise, which is provided for in the Agreement, include a provision for yet another renewal? Must Jos. A. Bank perpetually reexecute, *Groundhog Day*-like, the same set of terms, providing for a single renewal, again and again? The Franchisees say yes (ECF 68-1 at 38-39); Jos. A. Bank says no. ECF 73 at 10-11.

The question of the terms on which the Franchisees may "buy a successor franchise" has two subparts: First, what is the "then current form of franchise agreement" which Franchisor "customarily uses, or most recently used, in granting franchise rights for Jos. A. Bank Stores"? ECF 1-1 at 27-28. Second, regardless of which form is the correct form, may Jos. A. Bank alter the provisions of that form (such as the renewal section) to suit itself?

### A. The Franchisees Are Not Entitled to Perpetual Rolling Renewals

The Franchisees vigorously assert that JAB has "unwaveringly" allowed its franchisees "rolling renewals." ECF 68-1 at 16, 21-29, 42-47. *See*, *e.g.*, *id.* at 27-29. They contend in their

Reply that they are not seeking unlimited renewals because they recognize that Jos. A. Bank could establish a new "current form." But, according to the Franchisees, it could do so only by restarting its franchising program and "repeatedly [selling] franchise rights to new franchisees on such a new form." ECF 74 at 10. An interpretation that requires a business to start multiple new ventures in order to end an old one seems inherently suspect. In any event, it is unambiguously clear that the Franchisees are not entitled to unlimited rolling renewals.

The Franchisees submit two arguments in support of their claim that the Agreement requires rolling renewals. First, they posit that the plain language of the Agreement, in Section 16, provides for rolling renewals. ECF 68-1 at 33-39. Second, they assert that extrinsic evidence suggests that rolling renewals are required. *Id.* at 39-47. The Franchisees' first argument fails. And, because the Agreement is unambiguous on at least this point, there is no need to look to the Franchisees' argument based on extrinsic evidence—but that argument would fail in any case.

The plain meaning argument of the Franchisees seeks to go beyond the plain meaning of the Agreement. Initially, the Franchisees assert that the Agreement "obligated Jos. A. Bank to authorize the Franchisees to renew the [Agreement] at the end of their ten-year term absent some other breach of the [A]greement." *Id.* at 34. This is true. The Franchisees go on to claim that because the Agreement "direct[s] the parties and this Court to determine which franchise agreement form is 'then current,' 'customarily used,' or 'most recently used,'" the Court must "review the forms Jos. A. Bank has used to grant franchises and to renew or grant successor franchise rights to franchisees <u>other</u> than the parties to this case." *Id.* Not so.

As I see it, the Franchisees conflate two separate inquiries: (1) What form of successor franchise agreement is demanded by the Agreement; and (2) whether *rolling renewals* are demanded by the Agreement. The language quoted by the Franchisees is relevant to resolving

the first inquiry. But, the Agreement says nothing whatsoever to suggest an affirmative answer to the second inquiry.

Simply put, nothing in the plain language of the Agreement suggests that the Franchisees are entitled to rolling renewals. The phrase "rolling renewal" does not appear anywhere in the Agreement. Nor is the practice described anywhere in the Agreement. The Agreement is concerned only with the provisions governing the Term. At the expiration of the Term, the Agreement provides for the purchase of a successor franchise. ECF 1-1 at 27-28. It does no more. Because rolling renewals are not contemplated by the plain language of the Agreement, the Agreement plainly does not demand them.

The Franchisees' second argument, which they try to shoehorn into their plain meaning argument, is that the Franchisees are entitled to rolling renewals because Jos. A. Bank has consistently granted every other franchisee a rolling renewal. ECF 68-1 at 36-39. The argument is irrelevant to this inquiry, and its premise appears to be false.

Even if Jos. A. Bank had adopted a practice of granting rolling renewals to all other franchisees, the Agreement expressly provides in Section 19.07 that "Franchisor . . . shall not be deemed to have waived any right reserved by this Agreement by virtue of any custom or practice of the parties at variance with it." ECF 1-1 at 34. Thus, the Agreement does not allow the Franchisees to point to any prior practice of granting rolling renewals as an indication that Jos. A. Bank is obligated to offer rolling renewals *in this instance*. Nor may the Franchisees so easily evade the clear integration clause in Section 19.09 of the Agreement. *See* ECF 68-1 at 40. If it is relevant, the Franchisees may of course raise Jos. A. Bank's prior actions as evidence of the intentions of the parties at the time the Agreement was entered. *See John L. Mattingly Const. Co., Inc.*, 415 Md. at 327, 999 A.2d at 1074. But, the non-waiver clause of Section 19.07 and the

integration clause of Section 19.09 are unambiguous, and the Franchisees may not circumvent them for this purpose.

In any event, it seems that rolling renewals were not a universal practice, despite the Franchisees' assertions to the contrary. JAB has submitted evidence showing that the Asheville and Knoxville franchises were specifically not given "rolling renewals." ECF 73-6 at 63. Rather, their second renewal, from 2012 to 2022, was granted in consideration for the 2002 waiver of a right of first refusal held by the Asheville franchise. *Id.* Although the parties agreed to continue with the existing franchise agreement for those locations (as amended), the second renewal was not granted as a matter of course. Moreover, the New Orleans franchise appears to have been renewed a second time, but for a term of less than six years, "without prejudice to either party's position with regard to whether the . . . franchise agreement is renewable." *Id.* at 67.[8]

The Franchisees attempt to argue that the deal struck with the Asheville and Knoxville franchises is consistent with a practice of "rolling renewals," because the terms of their original franchise agreements were carried forward. ECF 74 at 5. I disagree. The deal plainly indicates a *quid pro quo* of supplementary renewal in exchange for a contract right; this suggests that, in the absence of such consideration, no further renewal would be granted. And, the Franchisees do not address the truncated extension of the New Orleans franchise.

Finally, the Franchisees cite confidential documents and disclosures made by Men's Wearhouse in the course of acquiring Jos. A. Bank in 2014. *See, e.g.*, ECF 69-4 (sealed

---

[8] The Franchisees have submitted as evidence the Declaration of John F. French, a part owner of the Franchisees and President of the New Orleans franchise. ECF 68-4, ¶¶ 2, 4. In the Declaration, French states: "In 2012, Jos. A. Bank allowed the franchise store located in New Orleans, Louisiana, to renew for a third *ten-year term* pursuant to the terms and conditions of the New Orleans Agreement." *Id.* ¶ 11 (emphasis added). In fact, it was six years, not ten years.

deposition); ECF 68-45 (list of franchises and expiration dates); ECF 69-11 (sealed valuation documents). The Franchisees point to the disclosures to suggest that JAB, or at least Men's Wearhouse, expected the franchises to last longer than JAB currently maintains. ECF 69-1 at 29-30. These documents do not reveal an ambiguity in the Agreement, and thus they are not relevant.

In sum, if the Franchisees are correct that they are entitled to a successor franchise agreement which itself contains a renewal provision, it is emphatically *not* because of Jos. A. Bank's historical practice of rolling renewals.

### B. The Agreement Does Not Unambiguously Indicate the Proper Form

There are three phrases in the Agreement that refer to the terms on which the Franchisees may buy a successor franchise: (1) "Franchisor's then current form of franchise agreement;" (2) "the form of franchise agreement . . . which Franchisor then customarily uses;" and (3) "the form of franchise agreement . . . which Franchisor . . . most recently used." ECF 1-1 at 28. None of these phrases unambiguously resolves which terms should apply with respect to the Franchisees' successor franchises.

In one sense, the Mandeville Form is the "then current" and "most recently used" form, because it was the most recent form to initiate a franchise agreement. *See* ECF 63-1 at 8-9. Jos. A. Bank focuses on the full phrase "customarily uses, or most recently used, in granting franchise rights," because it asserts that the phrase "in granting franchise rights" implies a *new* grant of rights, not simply an extension of existing rights. *See id.* at 19. Moreover, the Mandeville Form was the last real franchise agreement to be printed and signed by Jos. A. Bank and a franchisee, whereas each renewal that occurred after the Mandeville store was established

-22-

was executed with only "a notice of renewal and a check," which JAB maintains is not a "form of franchise agreement" at all. *Id.* at 20-21.

There is an appealing logic to Jos. A. Bank's argument in favor of the Mandeville Form. And, it should be noted, this interpretation gives fuller meaning to the phrase "then current form." If, for example, Jos. A. Bank had entered ten new franchise agreements using the Mandeville Form, but had subsequently agreed to renew two others with a simple "notice of renewal and a check," the Mandeville Form would necessarily still be the "then current form." Otherwise, Jos. A. Bank could never transition out of the franchising business, as both parties agree it wishes to do.

The Franchisees raise the inclusion of "the disjunctive 'or'" as an additional ambiguity standing between JAB and its preferred interpretation, because the Agreement itself offers no mechanism to choose between the "then current form," the "customarily used" form, or the "form most recently used." ECF 68-1 at 41. The Franchisees assert that, in any case, JAB should not be given "the unilateral right to choose whichever form it wishes." *Id.* In my view, the Franchisees overstate the importance of the word "or." The Agreement states that the successor franchise will be on the terms of "Franchisor's then current form of franchise agreement." ECF 1-1 at 27. I take the natural reading of the language to be that the "then current form" is to be either the form "which Franchisor then customarily uses" to grant franchise rights or, in the absence of such a custom, the "then current form" shall be the form that "Franchisor . . . most recently used" in granting franchise rights. *See id.* at 28. These phrases are not necessarily alternatives from which to choose.

Still, a reasonable person could read "customarily uses, or most recently used" and look to Jos. A. Bank's general practice of franchising, or to the most recent franchising activity. This

would point in favor of the Franchisees' interpretation. Although the most recent renewal of the Jackson franchise in 2014 is not a *new* grant of franchise rights, Jos. A. Bank was surely granting franchise rights to the Jackson store insofar as the existing rights were extended.

As stated, "a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible [to] more than one meaning." *Calomiris*, 353 Md. at 436, 727 A.2d at 363 (citation omitted). Because the phrases indicating which form should be used are susceptible to more than one meaning, the language is ambiguous.

### C. The Agreement Does Not Unambiguously Allow Jos. A. Bank to Alter the Form

The parties' selection of a form as their baseline would be irrelevant if Jos. A. Bank were entitled to alter the renewal clause of the form in material ways. ECF 63-1 at 18. Jos. A. Bank points to a clause in Section 16.03, which provides that the successor franchise agreement "may contain provisions, including royalty fees, materially different from those contained herein." ECF 63-1 at 18; ECF 1-1 at 28. According to Jos. A. Bank, this clause entitles it to make whatever material changes it wants, so long as it offers the Franchisees their single bargained-for renewal. ECF 63-1 at 18.

The Franchisees contest this interpretation. ECF 74 at 17. They assert that although Jos. A. Bank may present the Franchisees with a form that is materially different from the Agreement they originally signed in 2005, Jos. A. Bank may not deviate from whatever is its "then current form." *Id.* That is, the Franchisees must accept any established provisions of the "then current form," but they need not accept new changes specially targeted at them. This makes sense. The underlying principle is that the Franchisees are entitled to whatever other franchisees are getting, for better or for worse.

Reasonable people may disagree on the meaning of this clause, as well. Therefore, I cannot conclude as a matter of law that Jos. A. Bank has the right to alter materially the terms of a new franchise agreement. As a result, I cannot conclude that the Agreement unambiguously supports Jos. A. Bank's actions in offering the Franchisees a successor franchise agreement without a renewal option.

### D. Extrinsic Evidence Suggests a Genuine Dispute as to the Parties' Intentions

Because I conclude that the language of Section 16.01 and 16.03 of the Agreement is ambiguous with respect to the question of which form is to be the "then current form," I may look to the extrinsic evidence as to the parties' intent at the time of the Agreement's execution. *Cty. Commissioners of Charles Cty.*, 366 Md. at 444, 784 A.2d at 556. This inquiry is narrow: I shall only consider evidence of what the parties meant by "then current form," and by "the form of franchise agreement . . . which Franchisor then customarily uses, or most recently used, in granting franchise rights." ECF 1-1 at 28. These are the ambiguous phrases, and "[o]ne may not argue ambiguity in one contractual term or clause in order to gain the admittance of extrinsic evidence to contradict other terms or clauses in the contract that are unambiguous." *Calomiris*, 353 Md. at 441, 727 A.2d at 366.

The evidence as to the meaning of these phrases is thin. The Franchisees submit a letter signed by Tim Finley, the former CEO of Jos. A. Bank, and addressed to John W. Bell, III, President of the Franchisees. ECF 68-26. It indicates that the phrase "then current form of franchise agreement" implied no limitation on renewals. *Id.* at 2. The letter further explains that the phrase "which Franchisor then customarily uses" was included to prevent changes to the renewal term that might be less favorable to the Franchisees. *Id.*

There are reasons to discount this letter, however. Only weeks after the letter was signed by Finley on May 25, 2014, Bell hired Finley as a consultant. ECF 68-10 at 15. Finley is now Bell's employee. *Id.* And, at Finley's deposition, Finley admitted that he did not remember promising Bell anything about unlimited renewals, and that he never reviewed the franchise agreements signed in the 1990s with respect to Bell's stores. *Id.* at 21.

The Franchisees also submit the Declaration of John W. Bell, III, which states that his "understanding always has been that so long as a franchisee successfully performs and pays the franchise fee, it may renew its for [*sic*] an additional term of 10 years." ECF 68-2, ¶ 8. Of course, this Declaration is self-serving.

The only evidence the Franchisees offer that is contemporaneous with the 2005 drafting of the Agreement is an email dated August 5, 2005, from Jason Campbell, an attorney for JAB, to Al Schaeffer, an attorney for Bell. ECF 68-37 at 2. Attached to the email is JAB's proposed version of the Agreement. *Id.* The body of the email appears to respond to Mr. Schaeffer's suggestion to change the renewal language. *Id.* The email states, in relevant part (*id.*):

> Generally, all franchisors insist on their franchisees executing renewal agreements on the franchisor's then-current form of franchise agreement. If JAB ramps up its franchise program again and sells a bunch of franchises between now and the time that JAB-Columbia's agreement expires, then JAB-Columbia, at the time of renewal, would have to renew on the then-current terms of the franchise agreement (or else have the franchise terminate). Alternatively, if there were no new franchises, JAB-Columbia would renew based on the most recent renewal agreement (I'm not sure in that case that there would even be a "customary" agreement because there are presently so few franchisees); additionally, in that case, the terms being granted would necessarily be those based on 'renewal franchises' because that is all JAB would have.

The Franchisees interpret this email as an admission that, because Jos. A. Bank did not "ramp up" its franchise program by issuing the Mandeville Form to "a bunch of franchises," the terms of the subsequent franchise renewals, like the Jackson Form, must govern as the "most recently used" agreement. ECF 74 at 9-10. Jos. A. Bank seizes on Mr. Campbell's proviso that

"if there were no new franchises" the most recent renewal agreement would apply, and points out that in fact there *was* a new franchise, which used the Mandeville Form. ECF 73 at 20. Obviously, "one" is not "a bunch," but nor is it none.

Although Jos. A. Bank submits no documentation of the parties' intent as to the original drafting in 2005, it does point to an email sent in June 2009 from Chuck Frazer, Jos. A. Bank's general counsel, to Bell, Batt, and French, when the parties were negotiating the franchise agreements for the Harbison and Forest Drive stores. *Id.* at 32-33; ECF 68-39 at 2-3. That email rejects a proposal by Bell to lengthen the term of the original Columbia franchise agreement to coincide with the end date of the later-established franchises. ECF 68-39 at 2-3. Frazer wrote, *id.* at 2: "All agreements will expire with the expiration or earlier termination of the Columbia agreement. Assuming expiration per the agreement (as opposed to earlier termination), that means 8/31/15 if you choose not to exercise your renewal option or 8/31/25 if you do exercise your renewal option." According to Jos. A. Bank, this shows, at a minimum, that the parties were aware prior to the establishment of the Harbison and Forest Drive stores that their franchise agreements would end after one renewal. ECF 73 at 33.

"[S]ummary judgment is appropriate when the contract in question is unambiguous or when an ambiguity can be definitively resolved by reference to extrinsic evidence." *Washington Metro. Area Transit Auth.*, 476 F.3d at 235. Here, the Agreement is ambiguous as to which form is proper to use. And, the ambiguity cannot be definitively resolved by reference to extrinsic evidence.

Given the evidence presented by both sides, I cannot conclude that a reasonable jury would have to agree with one or the other. Therefore, I must deny summary judgment.

## IV.    Conclusion

For the reasons set forth above, I shall DENY both motions for summary judgment.  An

Order follows, consistent with this Memorandum Opinion.


Date:   December 15, 2017                    _____/s/_____
                                            Ellen Lipton Hollander
                                            United States District Judge